UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


DANNY B. MOORE and JACQUELINE MOORE,

      Plaintiffs,


v.                      Civil Action No. 2:06-0538


CABOT OIL & GAS CORPORATION,
a Delaware corporation,

      Defendant.


MEMORANDUM OPINION AND ORDER


      Pending are the motion to remand, filed by plaintiffs Danny B. Moore and Jacqueline Moore on July 18, 2006 and the motion to amend, filed by plaintiffs on March 5, 2007.


I.


      According to the complaint, plaintiffs purchased a 126-acre tract of land for $165,000 in 1997.  (Compl. at ¶ 2; Deed Book Excerpt, attached as Ex. A to Compl.).  Defendant Cabot Oil & Gas Corporation ("Cabot") asserts that a May 9, 1910, instrument ("the easement") gives it authority to install a

1

natural gas pipeline on plaintiffs' property.  (Memo. in Opp. to Mot. to Rem. at 4).  Plaintiffs claim this instrument is void. (Compl. at ¶ 9-16).  On June 5, 2006, plaintiffs filed an action for declaratory judgment, trespass, and slander of title in the Circuit Court of Putnam County.  (Compl.).

On June 30, 2006, defendant removed, served its answer, and filed counterclaims for interference with right of way and slander of title.  On July 18, 2006, the defendant moved for injunctive relief.

II.

Cabot is incorporated in Delaware and specializes in the exploration, production, transportation and sale of natural gas.  (Memo. in Opp. to Mot. to Rem. at 4).  Cabot's website indicates that 90% of its production and 90% of its reserves are natural gas.  (Cabot Profile, attached as Ex. A to Memo. in Opp. to Mot. to Rem.).  Cabot's natural gas exploration activities are divided into the following four regions in North America: East, West, Gulf Coast and Canada.  (Cabot's Website Excerpt, attached as Ex. G to Memo. in Supp. of  Mot. to Rem.).  These four regions span at least eleven American states and two Canadian provinces.

2

(Cabot Overview, attached as Ex. A to Memo. in Opp. to Mot. to Rem.).

Cabot's website lists three types of offices: corporate, regional, and district.  (Cabot's Website Excerpt, attached as Ex. E to Memo. in Supp. of Mot. to Rem.; Cabot Overview and Profile, attached as Ex. A to Memo. in Opp. to Mot. to Rem.).  The only corporate office is in Houston, Texas. (Id.).  There is one regional office in each of the four regions, and there are six additional district offices.  (Id.).

A.   Cabot's Nexus to West Virginia

"Approximately one-half (1/2) of the [d]efendants natural [gas] resources and four-fifths (4/5) of its drilling locations [are] in West Virginia."  (Memo. in Supp. of Mot. to Rem. at 7).  Specifically, plaintiffs explain this assertion in further detail with the following figures.

> The East Region, comprising mostly West Virginia, contains the majority of Defendant's current and potential operations.  The East Region holds 44.8% of Defendant's developed reserves, 57.0% of Defendant's undeveloped reserves, and 49.3% of Defendant's total acreage. The East Region holds 80% of Defendant's claimed drilling locations.

(Id. at ¶ 9).

3

Cabot's East region consists mostly of West Virginia, along with small portions of each of the five states bordering West Virginia.  (Cabot's Website Excerpt, attached as Ex. E to Memo. in Supp. of  Mot. to Rem.).  Charleston acts as the headquarters for defendant's East region. (<u>Id.</u>).

Of Cabot's six district offices, three are in West Virginia (Danville, Glasgow, and Pineville), one is in Texas, and two are in other states.  (Memo. in Supp. of Mot. to Rem. at ¶ 9).

B.   Cabot's Nexus to Texas

Houston is the headquarters for Cabot's executive operations, from which Cabot controls its corporate, management, and financial activities.  (Cabot's Website Excerpt, attached as Ex. E to Memo. in Supp. of  Mot. to Rem.).  "[A]ll direction, control and coordination of natural gas sales, transportation and distribution, accounting and financing activities, purchasing, central engineering activities, management information services, human resource activity, and workers compensation activities occur in Texas."  (Memo. in Opp. to Mot. to Rem. at 5).  Cabot's annual meeting takes place in Houston.  (Supp. Mot. in Opp. to

4

Rem. at 2).  A majority of Cabot's officers are located there. (Id.).

In addition to the executive direction, Cabot controls the production of its Gulf Coast region, which consists of approximately 40% of its total production, from its Gulf Coast regional office in Houston.[1]  (Memo. in Opp. to Mot. for Rem. at 5).  Cabot's 2005 natural gas production revenues were highest in the Gulf Coast region followed by the East region.[2]  (Cabot's 2005 Annual Report, attached as Ex. A to Supp. Memo. in Opp. to Mot. to Rem. at 49).  Although crude oil constitutes a small portion of their operations, Cabot's 2005 crude oil production revenues largely came from the Gulf Coast region.[3]   (Id. at 51).

Cabot's operations in Texas span two different regions. (Cabot's Website Excerpt, attached as Ex. E to Memo. in Supp. of Mot. to Rem.).  Cabot's Gulf Coast region consists of the Texas and Louisiana coasts.  (Id.).  The West region consists of five

---

[1]  Defendant discusses their numbers in terms of "production," whereas plaintiffs discuss their figures in terms of "resources."

[2] In its annual report, Cabot lists the following figures for "Natural Gas Production Revenue (In thousands)": Gulf Coast - $179,061; East - $171,902; West - $139,928; Canada - $7,802.

[3] In its annual report, Cabot lists the following figures for "Crude Oil Revenue (In thousands)": Gulf Coast - $65,427; West - $9,155; East - $1,463; Canada - $791.

5

basins, one of which is the geographically small Anadarko basin found in both Texas and Oklahoma.[4]  (Id.).

The Gulf Coast's regional office is located at the same site as the corporate office in Houston.  (Id.).  One of Cabot's six district offices is located in Corpus Christi, Texas.  (Id.).

III.

The court is vested with original jurisdiction of all actions between citizens of different states when the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).  The plaintiffs challenge the removal on two grounds.  (Memo. in Supp. of Mot. to Rem. at 2-4).  First, plaintiffs argue that both parties are West Virginia residents and thus not diverse for jurisdictional purposes.  (Id. at 5-7).  Second, plaintiffs contend that the amount in controversy does not exceed $75,000. (Id. at 7-10).

---

[4] The West regional office is located in Denver, Colorado. (Cabot's Website Excerpt, attached as Ex. E to Memo. in Supp. of Mot. to Rem.).  Only a small portion of the West region's territory lies in Texas.

6

A.    The Predicates for Removal Must be Narrowly Construed

        The statute establishing diversity jurisdiction is to
be strictly construed.  Shamrock Oil & Gas Corp. v. Sheets, 313
U.S. 100, 108-09 (1941);  Healy v. Ratta, 292 U.S. 263, 270
(1934);  Schlumberger Industries, Inc. v. National Surety Corp.,
36 F.3d 1274, 1284 (4th Cir. 1994).  The party seeking removal
bears the burden of establishing federal jurisdiction, and if
challenged, also bears the burden of proving that federal
jurisdiction was properly invoked.  Mulcahey v. Columbia Organic
Chemicals Co., 29 F.3d 148, 151 (4th Cir. 1994).


B.    Cabot's principal place of business is Texas, not West
      Virginia.

        For diversity purposes, a corporation is deemed "to be
a citizen of any State by which it has been incorporated and of
the State where it has its principal place of business."  28
U.S.C. § 1332(c)(1).  It is undisputed that Cabot is a Delaware
corporation.  (Compl. at 1).  The issue is whether Cabot's
principal place of business is in West Virginia, as plaintiffs
contend, or in Texas, as defendant contends.

        Our court of appeals has used two tests to guide its

7

determination of a corporation's principal place of business: the nerve center test and the place of operations test.  <u>Athena Automotive, Inc. v. DiGregorio</u>, 166 F.3d 288, 290 (4th Cir. 1999).

The nerve center test focuses on the locus of the corporation's policymaking and managerial activities and ordinarily is the location where the corporate directors and officers meet to decide corporate policy.  <u>DiGregorio</u>, 166 F.3d at 290.  It "makes the 'home office,' or place where the corporation's officers direct, control, and coordinate its activities, determinative."  <u>Peterson v. Cooley</u>, 142 F.3d 181, 184 (4th Cir. 1998).

On the other hand, the "place of operations" test "'looks to the place where the bulk of corporate activity takes place.'"  <u>Id.</u>

Our court of appeals has endorsed neither of these tests to the exclusion of the other.  <u>Id.</u>  The fifth circuit court of appeals thoroughly explained the interplay between the two tests and set forth a three prong framework for evaluating a corporation's principal place of business.

> [N]either the "nerve center" nor the "place of
> activity" test inflexibly dictates the corporation's

8

principal place of business. Rather the tests simply stand for general rules regarding the determination of a particular corporation's principal place of business: [1] the principal place of business of a far-flung corporation will generally be its nerve center, <u>see Scot Typewriter Co. v. Underwood Corp.,</u> 170 F. Supp. 862 (S.D.N.Y.1959); [2] the principal place of business of a corporation with significant administrative authority and activity in one state and lesser executive offices but principal operations in another state is generally the district of the former, <u>see Kelly v. U.S. Steel Corp.,</u> 284 F.2d 850 (3d Cir.1960); and [3] the principal place of business of a corporation with its corporate headquarters in one state and its single activity in another will generally be in the state of its operations, <u>see Lurie Co. v. Loew's San Francisco Hotel Corp., </u> 315 F. Supp. 405 (N.D.Cal.1970). These rules, however, are applied on a case-by-case analysis, weighing the particular facts. The two tests are therefore not mutually exclusive but rather complementary.

<u>J.A. Olson Co. v. City of Winona</u>, 818 F.2d 401, 409-410 (5th Cir. 1987). To the extent our court of appeals has not addressed the relationship between the two tests in a published opinion, the court adopts the reasoning of <u>J.A. Olson Co.</u>

Cabot's significant presence in eleven states and two provinces supports the conclusion that it is "far-flung and varied," triggering a virtual automatic exclusive application of the nerve center test as referenced in the first tier set forth in <u>J.A. Olson Co.</u> and, thus, a finding that the principal place of business is Texas.  See <u>id.</u>; <u>Mitchell v. Monongahela Power Co.,</u> 602 F.Supp. 756, 760 (S.D. W. Va. 1985).

Even assuming _arguendo_ that Cabot's activities are not "far-flung and varied," the second tier of <u>J.A. Olson Co.</u> further counsels in favor of a finding that Cabot's principal place of business is Texas.  Although the parties focused on different notions of what constitutes Cabot's "business,"[5] Cabot has significant and integral natural gas production and exploration operations in both Texas and West Virginia.  (Memo. in Supp. of Mot. to Rem. at 7; Supp. Memo. in Opp. of Mot. to Rem. at 2).  Where, as here, "the corporation's activities are dispersed to the point that no place in which the corporation conducts operations or activities can be denoted 'principal'" then "the nerve center, or corporate offices, will clearly be the principal place of business at which a corporation does business." <u>J.A. Olson Co.</u>, 818 F.2d at 407.  In this case, neither Texas nor West Virginia can be discerned as the "principal" state when the mix is limited to Cabot's revenue, production, and resources.  <u>See id.</u>  Consequently, the nerve center test controls and Texas is quite clearly Cabot's principal place of business.[6]

---

[5] As earlier noted, plaintiffs cite figures relating to Cabot's resources, while defendant focuses on Cabot's contacts with states in terms of production or revenues.

[6] A recent unpublished district court decision also concludes that Cabot's principal place of business is in Texas. <u>Eagle Lake Estates, LLC v. Cabot Oil & Gas Corp.</u>, 2006 WL 1328827

In attempting to persuade the court to use the "place of operations" test exclusively, plaintiffs cite this court's earlier pronouncement that "the place of operations test is most consistent with the legislative intent behind the diversity statute."  Columbia Gas Transmission Corp. v. Burdette Realty Improvement, Inc., 102 F. Supp.2d 673, 676 (S.D. W. Va. 2000) (citing 13B Charles A. Wright, Arthur W. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3625 at 633 (2nd ed. 1984)).  This statement, however, should not be viewed in isolation.  In Burdette Realty, the court discussed both tests and did not affirmatively choose one test over the other in evaluating Columbia Gas's principal place of business as being in West Virginia.  Id. at 679.  At least implicitly, the court used both tests as guideposts, and its decision was based on "the totality of the jurisdictional factors."[7]  Id.

_____

(E.D. La. 2006).

[7]  There were also some unusual facts that distinguish Burdette Realty from this case.  For instance, Columbia Gas's website indicated that its "operations headquarters" were located in Charleston, West Virginia.  Id. at 678.  The court also noted, "[i]n at least two complaints filed in this court within the past two years [1998-2000], Columbia has indicated that its principal place of business or primary center of operations is located in Charleston, West Virginia."  Id.  In the mid-1990's, Columbia relocated its executive offices from Charleston, West Virginia to Fairfax, Virginia, but the move relocated less than 10% of Columbia Gas's West Virginia workforce to Virginia.  Id. at 677.

11

Accordingly, the court adheres to its conclusion that Texas is the principal place of business of Cabot.


C.   The amount in controversy exceeds $75,000


In a case that is filed initially in federal court, a district court has original jurisdiction if the requisite diversity of citizenship exists unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." <u>St. Paul Mercury Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 289 (1938).  However, the "legal certainty" test applies only in instances in which a plaintiff invokes federal jurisdiction by filing a case in federal court.  <u>Landmark Corp. v. Apogee Coal Co.</u>, 945 F. Supp. 932, 935 (S.D. W. Va. 1996).  A different test applies "in removal situations . . . in which the plaintiff has made an unspecified demand for damages in

_____

The court explained that, "[h]ere, Columbia's corporate operations in transporting natural gas are carried out in West Virginia."  <u>Id.</u> at 679.  Meanwhile, there was no evidence in the court's opinion that a substantial portion of Columbia Gas's resources or revenues came from Virginia, the alleged new nerve center in that case.  <u>See</u> <u>id.</u> at 677-679.  In this case, however, a substantial amount of Cabot's revenues were generated from natural gas production in Texas.  (Cabot's 2005 Annual Report, attached as Ex. A to Supp. Memo. in Opp. of Mot. to Rem.).

state court." __Id.__  A defendant who removes a case from state court in which the damages sought are unspecified, asserting the existence of federal diversity jurisdiction, must prove by a preponderance of the evidence that the value of the matter in controversy exceeds the jurisdictional amount of $75,000. __Tapscott v. MS Dealer Serv. Corp.__, 77 F.3d 1353, 1357 (11th Cir. 1996); __De Aguilar v. Boeing Co.__, 11 F.3d 55, 58 (5th Cir. 1993) and __De Aguilar v. Boeing Co.__, 47 F.3d 1404 (5th Cir. 1995), __cert. denied__, 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995); __Gafford v. General Elec. Co.__, 997 F.2d 150, 158 (6th Cir. 1993); __Gaus v. Miles, Inc.__, 980 F.2d 564, 567 (9th Cir. 1992); __Sayre v. Potts__, 32 F. Supp.2d 881, 885 (S.D. W. Va. 1999); __Landmark Corp.__, 945 F. Supp. at 935.  With that being said, a court must consider the entire record and make an independent evaluation of whether the amount in controversy has been satisfied.  __Weddington v. Ford Motor Credit Company__, 59 F. Supp.2d 578, 584 (S.D. W. Va. 1999); __Mullins v. Harry's Mobile Home, Inc.__, 861 F. Supp. 22, 23 (S.D. W. Va. 1994).

The amount in controversy may be determined by the amount a potential judgment could mean for either party.  __Dixon v. Edwards__, 290 F.3d 699, 710 (4th Cir. 2002); __Government__

Employees Insurance Co. v. Lally, 327 F.2d 568, 569 (4th Cir. 1964).

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977). An affidavit from Cabot's Regional Land Manager that the failure to construct the pipeline would cause more than $75,000 worth of harm to the defendant provides an adequate basis in the record to satisfy the amount in controversy requirement. (Keim Affidavit, attached as Ex. B to Not. of Rem.). Because the ad damnum clause seeks punitive damages in addition to compensatory damages, evaluation from the plaintiffs' point of view would render the same result. (Compl. ¶ 28 and 30). Plaintiffs even admitted that it "may be true" that trespass damages would exceed the $75,000 threshold. (Memo. in Supp. of Mot. to Rem. at 9).

From either the plaintiffs' or defendant's point of view, the amount in controversy exceeds the jurisdictional threshold of $75,000.[8]

_____

[8] Because the amount in controversy is unquestionably satisfied, the court need not address the import of the $2,000 settlement offer made by Cabot to the plaintiffs to cover prospective damages to be caused by construction of the pipeline.

IV.

The central issue on the merits in this case is the
scope and validity of Cabot's easement running across plaintiffs'
property.  The easement stems from a 1910 instrument executed
between United Fuel Gas Company and Samuel Ashworth and Marsha
Ashworth.  Mountaineer Gas Company ("Mountaineer") was the
successor in interest to United Fuel Gas Company and retained the
easement in question.  On November 9, 2005, Mountaineer conveyed
the easement to Cabot by quitclaim deed.  (Mot. to Am. at ¶ 5).
However, this November 9, 2005 quitclaim deed reserved to
Mountaineer a right of way across plaintiffs' property.  (Id. at
¶ 6).

According to plaintiffs, a deposition of Mountaineer's
representative on March 1, 2007 revealed to plaintiffs "for the
first time" that Mountaineer claimed a vested right and planned
to use the right of way pursuant to the quitclaim deed, executed
on November 9, 2005.[9]  (Id. at ¶ 7).  Based upon this deposition
testimony, plaintiffs filed their motion to amend on March 5,

---

[9]  The relevant deposition testimony was not attached to
plaintiffs' motion nor was a pinpoint citation provided.

15

2007, which seeks to add Mountaineer as a non-diverse defendant.
The motion asserted that Mountaineer was an indispensable party
under Rule 19 of the Federal Rules of Civil Procedure because
plaintiffs sought to invalidate an instrument under which
Mountaineer claimed a right and thus complete relief could not be
accorded without their presence as a defendant in the action.
(Id. at ¶ 8).

        Our court of appeals has explained the analysis that
must be undertaken when plaintiffs seek to add a non-diverse
defendant in a diversity case following removal.  Mayes v.
Rapoport, 198 F.3d 457, 461-463 (4th Cir. 1999).  It begins with
the "two options" provided by 28 U.S.C. § 1447(e).  Id. at 461.
The statute provides, "[i]f after removal the plaintiff seeks to
join additional defendants whose joinder would destroy subject
matter jurisdiction, the court may deny joinder, or permit
joinder and remand the action to the State court."  28 U.S.C. §
1447(e).  "These are the only two options for a district court
faced with a post-removal attempt to join a nondiverse defendant;
the statute does not allow a district court to retain
jurisdiction once it permits a nondiverse defendant to be joined
in the case."  Mayes, 198 F.3d at 462 (footnote omitted).  The
choice between the two is "committed to the sound discretion of

the district court."  Id.  In making the decision, the court must
balance the following four prongs of Mayes:

> [1] the extent to which the purpose of the amendment is
> to defeat federal jurisdiction, [2] whether the
> plaintiff has been dilatory in asking for amendment,
> [3] whether the plaintiff will be significantly injured
> if amendment is not allowed, and [4] any other factors
> bearing on the equities.

Id. at 463 (internal citations omitted).[10]

Because plaintiffs were dilatory, the second prong of
Mayes weighs in favor of denying the motion to amend.  Plaintiffs
knew about the relationship between Cabot and Mountaineer for
many months.  In fact, plaintiffs' memorandum in support of their
motion to remand, filed on July 18, 2006, attached the quitclaim
deed as Exhibit A.  Cabot explains that plaintiffs produced a
copy of the quitclaim deed as part of their Rule 26 disclosures
on September 12, 2006.  Plaintiffs did not, however, file its
motion to amend until several months later on March 5, 2007,
after the close of discovery and while dispositive motions were
pending.

Plaintiffs respond that they have contested federal

---

[10]  Other supplemental factors that a court may consider as
part of the balancing act described above include the temporal
proximity between removal and a motion to amend and the "danger
of parallel lawsuits in federal and state court . . . ."  Id.

jurisdiction from the outset with their motion to remand, filed on July 18, 2006. Plaintiffs argue they would have seized an easy opportunity to remand the action to state court had they known previously of Mountaineer's involvement. However, the court cannot overlook the fact that plaintiffs were in possession for several months of documents showing Mountaineer's right of way over plaintiffs' property and thus agrees with Cabot that plaintiffs were dilatory in seeking to amend.

The third prong of Mayes, which considers whether any "significant injury" to plaintiffs would result, likewise supports denial of the motion to amend. Cabot explains the motion to amend is moot inasmuch as a subsequent quitclaim deed, executed on March 14, 2007, released any rights Mountaineer might have in the easement at issue, including the aforementioned right of way. There is no claim that Mountaineer damaged or trespassed upon plaintiffs' property in the past. Thus, Cabot aptly contends, the amendment to add Mountaineer would be futile.

In plaintiffs' reply, they counter that the issue is not moot as the quitclaim deed provides further proof in support of the trespass claim in Count II of the amended complaint. However, plaintiffs' own draft amended complaint, attached to the motion to amend, contradicts this assertion. The declaratory

18

judgment claim in Count I of the amended complaint is alleged
against "defendants" generally, whereas the trespass claim in
Count II of the amended complaint and the slander of title claim
in Count III of the amended complaint both are alleged against
defendant Cabot only.

        Because plaintiffs have been dilatory in seeking to
amend and because plaintiffs would not be "significantly
injured," the second and third prongs of <u>Mayes</u> counsel in favor
of denying the motion to amend.  Plaintiffs do not offer any
argument that would fall within the fourth catch-all prong of
<u>Mayes</u>.  Consequently, the consideration and weighing of the
factors set forth in <u>Mayes</u> directs denial of the motion to amend.

V.

        For the reasons stated herein, it is ORDERED that
plaintiffs' motion to remand be, and it hereby is, denied.  It is
further ORDERED that plaintiffs' motion to amend be, and it
hereby is, denied.

19

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record.

DATED: May 2, 2007

John T. Copenhaver, Jr.
United States District Judge

20